**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

GAEL SPENCER                    :

      Plaintiff,              :
                         Case No. 3:10cv00365

 -vs-                           :

                         District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,             :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,        :

      Defendant.             :

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Gael Spencer worked for approximately fourteen years as a nurse, first in a hospital then in a physician's office. In 2000 she began experiencing vestibular dysfunction involving episodes of vertigo, lightheadedness, and tinnitus. (Tr. 144). She was ultimately diagnosed with Meniere's disease – a "recurrent and usually progressive group of symptoms including progressive deafness, ringing in the ears, dizziness, and a sensation of fullness or pressure in the ears. . . ." <u>Taber's Cyclopedic Medical Dictionary</u> at 1271 (19th Ed. 2001). Plaintiff also has diabetes, high blood pressure, and depression.

She stopped working full-time as a nurse in 2000. She applied for Disability

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Insurance Benefits (DIB) in 2006 asserting she was eligible for benefits because she was under a disability due to Meniere's disease and vertigo. The Social Security Administration disagreed and denied Plaintiff's DIB application based mainly on the conclusion that her Meniere's disease and vertigo did not constitute a benefits-qualifying disability. The Social Security Administration's final denial of Plaintiff's DIB application is subject to judicial review, *see* 42 U.S.C. §405(g), which she is now due.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #7) , the administrative record, and the record as a whole.

## II.    Plaintiff's Background

Plaintiff's DIB application identified October 1, 2003 as her a disability onset date. At that time, she was 46 years old and thus considered a younger person for the purpose of resolving her DIB application. *See* 20 C.F.R. §404.1563(c); *see also* Tr. 23, 49.

Plaintiff has a high-school education, and she earned an Associates Degree in 1989. With her degree in hand, she began working as a registered nurse and continued to do so until September 2003, although her earnings after March 2000 were insubstantial. (Tr. 19, 304).

After initial administrative denials, Plaintiff's DIB application and records proceeded to a hearing before Administrative Law Judge (ALJ) Amelia G. Lombardo. During the hearing (in October 2008), Plaintiff testified that her primary disability was

Meniere's disease and vertigo. (Tr. 305-06). She noted, "I have nystagmus in my eyes. When I am looking at the [ALJ], my right eye beats back and forth and during heavier episodes of dizziness it could be, it can be quite pronounced, and . . . it's worse in my right eye than my left."[2] (Tr. 313).

Plaintiff testified that she cannot walk long distances without having dizziness. (Tr. 306). There are days she can walk only halfway through her house with difficulty; other days she can walk around her block "before having a problem." (Tr. 306-07). Yet she can walk around the block only "[s]ometimes, with assistance . . . ," and she did not "go alone, ever." (Tr. 307).

During the administrative hearing, the ALJ noted that Plaintiff used a wheelchair. She explained to the ALJ that she used a wheelchair anytime she needed to walk long distances. She had done so for about three years. (Tr. 306).

Plaintiff informed the ALJ that she had difficulty standing and sitting due to dizziness. (Tr. 307). She could not climb stairs without help because she had previously fallen down stairs. *Id*. She experienced several vertigo attacks daily and suffered from fatigue afterwards. (Tr. 308-09). And her dizziness occurred off and on:

> [T]he best way I can say it, is to . . . tell you that during the day I could be fine one half hour and get dizzy and that can last anywhere from a few seconds, a few minutes or longer and I can have periods of several times a day. So, in a week's time I can, I don't even know what kind of

---

[2] Nystagmus refers to "[i]nvoluntary back-and-forth or cyclical movements of the eyes." Taber's Cyclopedic Medical Dictionary at 1426 (19th Ed. 2001). Generally, it is an indicator of vertigo when it occurs upon artificial stimulation (such as headshaking). *See* The Merck Manual at 665-67 (17th Ed. 1999).

number to give you, because it just hits when it wants to hit and there's times I can work through it and times I can't.

(Tr. 309).

After an episode of dizziness, Plaintiff became very tired. The dizziness "absolutely wears [her] out. [Her] legs . . . can get very weak." *Id.* Although her symptoms waxed and waned over the years, her symptoms occurred every day, varying "anywhere from mild to strong." *Id.*

Plaintiff could not concentrate when she experienced dizziness. (Tr. 315). When it was milder, she tried to work through it, depending on its severity. When it was most severe, she could not do anything at all. *Id.* When asked how often she experienced severe dizziness, she testified, "I'm going to say I've got at least three days during the week where it's difficult to function." *Id.*

In 2002 Plaintiff had a shunt surgically implanted in her right ear. It helped drain fluid for about 8 weeks but then fluid started backing up, as it had before. (Tr. 311).

As to her daily activities, Plaintiff acknowledged that she could do dishes, dust, and run her sweeper – depending on how she felt. (Tr. 309). She could drive but only through her neighborhood or on side streets, not on highways. (Tr. 310). She needed someone to go grocery shopping with her because, from her wheelchair, she could not reach items on higher shelves. She usually had someone with her wherever she went. It was, she noted, "not safe for me to be out by myself." *Id.*

## III. Medical Opinions

### A. David Page, MD:
### Treating Physician, Primary Care

Dr. Page treated Plaintiff for Meniere's disease from February 7, 2003 through August 5, 2008.  (Tr. 177-78, 181, 191, 194-96, 198, 207-08, 292).  He also treated her for many other health problems – for example, unstable right knee with crepitus, high blood pressure, hypoglycemia, rotator cuff pain, allergies, chest pain, and foot pain.  (Tr. 178-81, 184, 186-91, 194-96, 198, 202, 204-05, 207-08, 292).

When seen by Dr. Page on May 10, 2007, Plaintiff complained of "chronic dizziness" and stated that she sometimes could not function in daily living, and was unable to concentrate for any length of time due to dizziness.  (Tr. 177).  The same day Dr. Page answered written interrogatories.  He opined that Plaintiff could not do the following: (1) attend work promptly and regularly, (2) sustain attention and concentration on work to meet normal standards of productivity, (3) demonstrate reliability, (4) maintain attention and concentration for extended periods, (5) complete a normal workday or workweek without interruption from symptoms, (6) perform at a consistent pace without an unreasonable number and length of rest periods, and (7) be punctual within customary tolerances.  (Tr. 174-75).  Dr. Page estimated that Plaintiff would be absent from work more than three times a month.  Dr. Page based his opinions on Plaintiff's inability "to concentrate for any length of time due to recurrent dizziness & ear pressure/pain/ringing." *Id.*

**B.     Ronald L. Devore, MD:**
        **Consulting Physician, ENT**

Plaintiff saw Dr. Devore in February 2002.  She reported a history of balance

problems for the previous two years.  Dr. Devore noted that a "prior ENG

[electronystagmographic] shows very significant left beating nystagmus following head

shake." (Tr. 144)(footnote added).  He diagnosed Plaintiff with "[s]ignificant vestibular

dysfunction, based on headshaking-induced nystagmus." *Id.*  And Dr. Devore suggested

that Plaintiff follow up with neurotology as she might be a candidate for intratympanic

perfusion or vestibular nerve section.  *Id.*

**C.     David L. Steward, MD:**
        **Treating Specialist, ENT**

Dr. Steward first examined and evaluated Plaintiff in April 2002 "for episodic

vertigo." (Tr. 268).  Dr. Steward wrote, "My assessment is the patient has episodic

vertigo of uncertain etiology.  Given the 42% unilateral weakness on the left, there is at

least a peripheral component to this.  Given her neurologic symptoms, however, a basilar

migraine variant or vertebro basilar insufficiency could also be superimposed." (Tr. 268).

He recommended a 2000 mg sodium chloride diet, Cawthorne vestibular exercises, and a

diuretic.  (Tr. 269).

On a follow-up visit, in May 2002, Plaintiff reported continuing episodic vertigo

occurring daily to weekly and lasting for several minutes.  (Tr. 267).  Dr. Steward

assessed Plaintiff with vertigo and possible Meniere's disease; he recommended

medication therapy.  He noted, "Should she fail to improve with medical therapy, consideration for endolymphatic mastoid shunt surgery or transtympanic Gentamicin would be a next reasonable step.  *Id*.

Plaintiff did not improve.  In August 2002 Dr. Steward recommended a right endolymphatic mastoid shunt surgery.  (Tr. 264).  Plaintiff underwent this surgery in September 2002.  (Tr. 147).  During the procedure, her endolymphatic sac was found to be "markedly inflamed."  (Tr. 148).  One month later, Dr. Steward examined Plaintiff, again describing her "probable Meniere's syndrome," and he noted that Plaintiff reported experiencing no episodes of vertigo since her surgery.  (Tr. 263).

Six months later, in March 2003, Plaintiff saw Dr. Steward for, in his words, "right Meniere's syndrome."  (Tr. 261).  She informed Dr. Steward that she had experienced two severe episodes of vertigo "and subjective decreased hearing on the right and right ear fullness and tinnitus."  (Tr. 261).  These problems, however, had resolved by the time she saw Dr. Steward, and he recommended continuing "with her medical Meniere's regimen."  *Id.*

In July 2003 Dr. Steward indicated that Plaintiff reported "no episodes of vertigo and improvement in her right ear fullness and tinnitus."  (Tr. 260).  Yet, she had "noticed increasing fullness and tinnitus in her left ear with fluctuating hearing loss."  *Id*.  Dr. Steward felt that Plaintiff's Meniere's disease was adequately controlled and recommended that she continue on her medication regimen.  *Id.*  Dr. Steward concluded, "My assessment is that she has a palpable bilateral Meniere's syndrome adequately

controlled . . . ." *Id.*

Plaintiff next saw Dr. Steward in November 2003. He described her exam as unremarkable. She reported "increasing right ear fullness." (Tr. 259). "An audiometric evaluation remains normal." *Id.* Dr. Steward continued Plaintiff on her low-salt diet and Dyazide.

Nine months later, in August 2004, Plaintiff followed up with Dr. Steward. He reported that Plaintiff's "symptoms have worsened and are now debilitating." (Tr. 258). He recommended further testing, which Plaintiff underwent. (Tr. 249-58). On September 15, 2004, Dr. Steward wrote: "I had the pleasure of following up with Gael for debilitating vertigo. ENG demonstrated a 28% weakness in the left ear. . . ." (Tr. 249). They discussed left-side surgery but he was "not confident that this will improve her symptoms significantly . . . ." *Id.* They discussed other options, and he recommended a trial of Valium.

When Plaintiff next saw Dr. Steward, in October 2004, he characterized as having "debilitating vertigo and probable bilateral Miniere's syndrome." (Tr. 248). He noted that Plaintiff's symptoms had markedly improved with Dyazide and Valium (as needed). Plaintiff reported "intermittent diplopia [double vision] without vertigo symptoms." *Id.*

Plaintiff next saw Dr. Steward in June 2005. He explained that Plaintiff had "vertigo and probable bilateral Miniere's syndrome. She reports significant improvement in her vertigo with occasional mild dysequilibrium. I have recommended she continue with her low sodium diet and Dyazide. . . ." (Tr. 247).

A February 2006 ENG showed an 18% weakness in her left ear. (Tr. 241).

Dr. Steward reported, on April 6, 2006, that Plaintiff had vertigo, which was probably bilateral Meniere's syndrome. She had "episodic debilitating vertigo with disequilibrium, which started in 2000 and worsened in 2006." (Tr. 164). Dr. Steward noted, "Diagnostic testing revealed a left unilateral weakness consistent with a peripheral vestibular deficit in 4/2002, 9/2004, and 2/2006." *Id*. Plaintiff's right endolymphatic mastoid shunt surgery had not alleviated her vertigo and, although she took the diuretic (Dyazide) as prescribed, her episodic vertigo responded poorly to it. *Id*. Dr. Steward opined that Plaintiff was "physically impaired in her ability to sit, stand, walk, bend, stoop, lift, or grasp as a result of the disequilibrium and episodic vertigo. Additionally, this causes difficulty with concentration and independent function." *Id*.

In May 2007 Dr. Steward wrote a letter documenting Plaintiff's medical history. He explained that he had treated Plaintiff since April 2002 for "episodic vertigo, which has become progressive and debilitating since 2003." (Tr. 240). Dr. Steward noted that her condition was unresponsive to medical management; he therefore believed that she was "unable to perform any substantial gainful activity on a sustained basis and, given the longstanding history, this is expected to persist." *Id*.

Dr. Steward explained that Plaintiff had reported experiencing many episodes of vertigo and disequilibrium during the day, and she also reported symptoms of "tinnitus, ear fullness and pain, and nystagmus resulting from vertigo, all associated with her diagnosis of Meniere's syndrome." *Id*. Dr. Steward wrote that Plaintiff had undergone a

right endolymphatic mastoid shunt surgery that had not been successful in improving her condition. And he explained that Plaintiff "has undergone multiple tests in the past, most notably electronystagmogram in 2002, which revealed a left unilateral vestibular weakness of 42% consistent with left peripheral vestibular pathology and Meniere's syndrome. Repeat ENG testing in 2004, showed persistent left-sided unilateral weakness. Repeat testing in 2006, again showed the same results." (Tr. 240). Dr. Steward concluded:

> I believe the patient truly experiences vertigo and tinnitus, as well as disequilibrium. This results in debilitating impairment with waxing and waning symptoms resulting in variable levels of functioning such that I think it would be unlikely that this patient would be able to obtain gainful employment.

(Tr. 240).

### D. Walter Holbrook, MD; Rebecca R. Neiger, MD: Record-Reviewing Physicians

In June 2006 Dr. Holbrook reviewed the documents in the administrative record, including Plaintiff's medical records. He believed that Plaintiff had no exertional work limitations except she was never to climb ladders, ropes, and scaffolds and could only occasionally balance. (Tr. 166-67). According to Dr. Holbrook, Plaintiff must avoid all exposure to hazards such as machinery, heights, etc. (Tr. 169).

In October 2006 Dr. Neiger reviewed the evidence in the administrative record, and she "affirmed, as written" Dr. Holbrook's opinions. (Tr. 173). Dr. Neiger did not explain her affirmation. *See id.*

10

E.    **Roland Kowal, MD:**
      **Testifying Medical Expert, ENT**

Dr. Kowal testified during the ALJ's hearing.  When asked how Meniere's disease is diagnosed, Dr. Kowal answered: "It's diagnosed usually by these episodes of vertigo, true vertigo where you spin around and where you kind of lose your balance and very distinctly there is also an associated hearing loss."  (Tr. 317).

When asked if he could point "to any tests evidence that would cause [him] to diagnose Meniere's disease," Dr. Kowal answered, "Yes.  She had the . . . electrochochleogram.  The last one showed evidence that she has this vestibular disease and dysfunction."  (Tr. 318).  He then clarified that he was relying on the results of multiple tests performed throughout the years, which have "all showed vestibular dysfunction."  (Tr. 318).

When asked about the results of audiometric tests, Dr. Kowal explained, "Her hearing is, she doesn't have any significant hearing loss, that's the only thing, so this is a very typical type of vestibular dysfunction.  And, I suspect . . . that she has a migrainous type of vestibular dysfunction which is a little different that the ordinary Meniere's type, but she definitely has a real problem as far as equilibrium or balance problems."  (Tr. 318-19).

Dr. Kowal characterized Plaintiff 's vestibular dysfunction as "a very severe impairment."  (Tr. 319-20).  He added, "I mean it's very difficult to function as far as work goes, there's a very high level of absenteeism because these people have these

attacks and they can't function very well." (Tr. 320). The ALJ asked Dr. Kowal whether Plaintiff's "symptoms, allegations regarding her symptoms are consistent with the medical evidence [he had] reviewed?" Dr. Kowal answered, "Yes. Yes, they are. She's got, she's got real problems." (Tr. 320).

As to her functional limitations, Dr. Kowal stated, "Well, she's got almost any type of movement . . . and she has another factor, she has periods of hypoglycemia . . . . This will also cause a problem when she gets up . . . she'll have faintness in addition or syncope, so these are all components that should be considered as far as her disability goes. She can't . . . get up real quick sometimes. She can't move her head. It's . . . difficult to function normally under these circumstances." (Tr. 320).

The ALJ also questioned Dr. Kowal whether Plaintiff's Meniere's disease satisfied the criteria set forth in Listing 2.07 – describing "Disturbances of labyrinthine-vestibular function (including Meniere's disease) . . . ." – of the Commissioner's Listing of Impairments,[3] Dr. Kowal opined:

> She . . . does meet the [criteria] as far as A, she certainly does meet that, she has a history of, of the testing, abnormal testing and the only part that she doesn't meet is that of B where she has some hearing loss, but I think this is offset by her other, other things that are occurring, her probably migrainous type of vestibular dysfunction is present and also her hypoglycemia type of thing and these are all factors that would I think tend to offset . . . not losing her hearing.

(Tr. 321). The ALJ then asked, "So . . . would it be your opinion then that even though

---

[3] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

she does not meet, because she doesn't have the hearing loss, that she equals Listing 2.07?" *Id.* Dr. Kowal answered, "Yes, I think so." *Id.*

As to when she reached that point of equaling Listing 2.07, Dr. Kowal believed that occurred by the date of Dr. Steward's June 29, 2005 letter. (Tr. 321-22).

## IV. **Administrative Review**

### A. **"Disability" Defined**

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 275 (6th Cir. 2010).

### B. **ALJ Lombardo's Decision**

ALJ Lombardo evaluated the evidence employing the five-step sequential evaluation mandated by the Social Security Regulations, specifically 20 C.F.R. §404.1520(a)(4). The complete sequential review answers five questions:

1.     Has the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.     Considering the claimant's residual functional capacity,[4] can she perform her past relevant work?

5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010).

ALJ Lombardo's pertinent findings began at Step 2 where she concluded that Plaintiff had the severe impairment of Meniere's disease. (Tr. 19). At Step 3 the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings. (Tr. 19-21).

At Steps 4 and 5 ALJ Lombardo concluded that Plaintiff retained the ability to perform work at all exertional levels, with certain limitations, and that she was able to perform a significant number of jobs that existed in the national economy. (Tr. 21-25).

## V.   <u>Judicial Review</u>

Judicial review determines, in part, " whether the ALJ applied the correct legal

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do at work despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

standards . . . ." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). The Social Security Act and resulting Regulations establish the applicable legal standards by, for example, instructing ALJs to provide "good reasons" for the weight placed on a treating physician's opinions. *See* 20 C.F.R. §404.1527(d)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

> It is an elemental principle of administrative law that agencies are bound to follow their own regulations.... The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates.... An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process. Where a prescribed procedure is intended to protect the interests of a party before the agency, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.

*Wilson*, 378 F.3d at 545 (internal citations and punctuation omitted).

Judicial review of an ALJ's decision also considers "whether the findings of the ALJ are supported by substantial evidence." *Blakley*, 581 F.3d at 405; *see Bowen*, 478 F.3d at 745-46. Substantial evidence consists of "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The existence of substantial evidence does not depend on whether the Court disagrees or disagrees with the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead the ALJ's

decision is affirmed "if his findings and inferences are reasonably drawn from the record or supported by substantial evidence even if that evidence could support a contrary decision." *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010).

"Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746); *see Wilson*, 378 F.3d at 546-47; *see also Kalmbach v. Comm'r of Soc. Sec.*, 2011 WL 63602 at *6 (6th Cir. 2011)("we must reverse and remand if the ALJ applied the incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different.")

## VI.    Discussion

### A.    The Parties' Contentions

Plaintiff frames her case under two main issues:

A.    The Administrative Law Judge erred [at Step 3 of the sequential evaluation] in finding that Plaintiff's Impairment did not meet or equal Listing 2.07.

B.    The Administrative Law Judge erred in rejecting the opinion of Plaintiff's treating physician and the Government's own medical expert [Dr. Kowal].

(Doc. #6, PageID #48)(emphasis and capitalization omitted).

The Commissioner contends that the ALJ did not err at Step 3 because no

physician opined that Plaintiff met Listing 2.07, and "even the [testifying medical expert], Dr. Kowal, acknowledged that Plaintiff did not have proof of hearing loss and testified that she did not meet the Listing." (Doc. #7, PageID #s 68-69). The Commissioner further maintains that Plaintiff has failed to show any error in the ALJ's finding that her impairments did not medically equal any Listing. And the Commissioner asserts that the ALJ reasonably rejected Dr. Page's opinions and reasonably evaluated Dr. Steward's "post-hoc opinions from 2006 and 2007." (Doc. #7, PageID #74).

**B.** **Analysis**

The Listings describe certain physical and mental impairments that the Social Security Administration (SSA) considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §404.1525(a); *see Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). At step three of the sequential evaluation, "[c]laimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006) (en banc) (internal citations omitted). Two avenues of proof are potentially available: meeting or medically equaling a Listing. *See Zebley*, 493 U.S. at 530-31; *see also* 20 C.F.R. §§404.1525, 404.1526.

To show she met a particular Listing, a claimant must establish all of the criteria set forth in the Listing. 20 C.F.R. §404.1525(c)(3). If a single criterion is lacking, the

claimant does not meet the Listing. *Id.*; *see Zebley*, 493 U.S. at 530. And, a diagnosis alone does not suffice. *See* 20 C.F.R. §404.1525(d).

If one (or more) Listing criterion is not met, the possibility of medical equivalence remains. The Regulations explain:

> We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

20 C.F.R. §404.1526(b)(1)(ii). Medical equivalence is absent when the claimant merely shows that the "overall functional impact" of her impairments are as severe as one described in the Listings. *Zebley*, 493 U.S. at 531-32.

The pertinent Listing in Plaintiff's case – Listing 2.07 – states:

> *Disturbance of Labyrinthine – Vestibular Function (Including Meniere's disease)*, characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
>
> A.   Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
>
> B.   Hearing loss established by audiometry.

20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that Plaintiff did not meet Listing 2.07's criteria because she had not suffered hearing loss. (Tr. 19). Substantial evidence supports this conclusion. Plaintiff's medical records fail to indicate that she suffers from hearing loss established by audiometry. The testifying medical expert – Dr. Kowal – acknowledged as much. *See* Tr. 321 ("the only part of that she doesn't meet is that of [2.07]B . . ."). Additionally, no

18

physician of record has opined that Plaintiff has suffered hearing loss sufficient in severity or duration to meet Listing 2.07.

Yet, Dr. Kowal did opine – and Plaintiff seizes on this – that Plaintiff's suffered from vestibular dysfunction and Meniere's disease and that her impairment medically equaled Listing 2.07, despite her lack of hearing loss. (Tr. 317-23). He explained that Plaintiff's lack of hearing loss "is offset by her other, other things that are occurring, her probably migrainous type of vestibular dysfunction is present and also her hypoglycemia type of thing and these are all factors that would I think tend to offset . . . not losing her hearing." (Tr. 321).

The ALJ disagreed. She concluded that Plaintiff's Meniere's disease "cannot reasonably be found to equal the requirements of this section [Listing 2.07] despite the medical expert's testimony to the contrary." (Tr. 20). Although the ALJ acknowledged that Dr. Kowal had identified June 29, 2005 as the date he thought Plaintiff's condition equaled Listing 2.07 (Tr. 20), she rejected Dr. Kowal's opinion based on various notes or reports indicating improvement in Plaintiff's condition. Each piece of evidence, however, pre-dated June 29, 2005 when, according to Dr. Kowal's, Plaintiff's condition deteriorated. *See* Tr. 321-22. The ALJ, moreover, did not connect her reliance on pre-June 29, 2005 evidence with a reason for discounting Dr. Kowal's opinion that Plaintiff's Meniere's disease did not equal Listing 2.07 until June 29, 2005. Perhaps the ALJ viewed pre-June 2005 evidence of improvement to be inconsistent with Dr. Kowal's opinion. Yet the ALJ did not say so. More significantly, the evidence of Plaintiff's

19

improvement, at times, before June 2005 tends to be consistent with Dr. Kowal's opinion that Plaintiff's Meniere's disease and vestibular dysfunction did not deteriorate to the point of medically equaling Listing 2.07 until after June 29, 2005. And, the ALJ did not rely on any medical source opinion that identified a conflict between the pre-June 2005 evidence of improvement and Dr. Kowal's opinion that Plaintiff's condition deteriorated to the point of medically equaling Listing 2.07 after June 29, 2005.

The ALJ also rejected Dr. Kowal's reliance on Dr. Steward's records. (Tr. 20). Again, the ALJ pointed to evidence showing Plaintiff's condition improved at times. For example, the ALJ noted, "ENT testing performed on February 22, 2006 revealed further improvement with a reduction in left caloric weakness to only 18% (Exhibit 10-F at 2). Approximately 15 months later, Dr. Steward reported that he saw the claimant for 'episodic vertigo, which has become progressive and debilitating since 2003' (Exhibit 10-F at 1). However, as shown above, this statement directly contradicts his previous reports documenting significant reported improvement in both the frequency and severity of the claimant's alleged symptoms. This significantly undermines Dr. Kowal's opinion, particularly when he based his opinion on a letter that actually reported 'significant improvement.'" (Tr. 20). The ALJ's reasoning overlooked the fluctuating severity of Meniere's disease, in general, and the fact that Plaintiff's periods of improvement were consistent with the Dr. Kowal's and Dr. Steward's opinions.

The Listings explain: "Meniere's disease is characterized by paroxysmal attacks of vertigo, tinnitus, and fluctuating hearing loss. Remissions are unpredictable and

irregular, but may be longstanding; hence, the severity of the impairment is best determined after prolonged observation and serial reexamination. . . ." Listing 2.00B(2), 20 C.F.R. Part 404, Subpart P, Appendix 1. So it was with Plaintiff: At times her symptoms improved; at other times her symptoms deteriorated. Rather than evaluating Dr. Kowal's and Dr. Steward's opinions in light of the sudden, temporary, or fluctuating symptoms indicative of Meniere's disease, generally, and Plaintiff's episodic symptoms, and by failing to recognize that Plaintiff could have unpredictable, irregular – even longstanding – remissions, the ALJ improperly selected those portions of Plaintiff's medical record that supported a non-disability determination without considering that such evidence of improvement was consistent with Dr. Steward's and Dr. Kowald's opinions. This constituted error because an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports [her] position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *see Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."); *see also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

In addition, the ALJ discounted, without explanation, those aspects of Dr. Kowal's testimony explaining his view of Plaintiff's Listing-level Meniere's disease. He testified:

> [Meniere's disease is] diagnosed usually by these episodes of

vertigo, true vertigo where you spin around and where you kind of lose your balance and very distinctly there is also an associated hearing loss. Now, in her particular case she, she doesn't have a significant amount of hearing loss, but she certainly has evidence of vestibular pathology because she'd got, you know, a saglar [phonetic] gland that's been abnormal all along. And, she has some other factors, I think even though she doesn't have the migraine headaches she, at least at [sic; possibly "has"] the migrainous type of thing that further aggravates her, her vertigo and disequilibrium. She also has, apparently, episodes of hypoglycemia which also cause some faintness and, difficulty as far as balance once in a while.

(Tr. 317) ("phonetic" brackets in original; other brackets added).

Dr. Kowal continued:

Well, it's not . . . what we call a typical Meniere's disease. . . . [S]he certainly has a very difficult problem because, because of that factor, that's why I say there's some other factors there entering into the cause and we don't know what they are, and apparently no one's been able to find out what . . . is aggravating her vertigo. I kind of think it's on a vascular basis, because one of . . . her tests showed that she had a collection of blood vessels and, and sometimes when . . . the blood vessels dilate, just like in the migraine for the headache, if they occur in the ear they cause fullness and . . . difficulty in the ear, but this is so rare that it's . . . very, very difficult to diagnose. . . .

(Tr. 319). As noted above, *supra*, § II(E), Dr. Kowal characterized Plaintiff 's vestibular dysfunction as "a very severe impairment." (Tr. 319-20). He added, "I mean it's very difficult to function as far as work goes, there's a very high level of absenteeism because these people have these attacks and they can't function very well." (Tr. 320). The ALJ asked Dr. Kowal whether Plaintiff's "symptoms, allegations regarding her symptoms are consistent with the medical evidence [he had] reviewed?" Dr. Kowal answered, "Yes. Yes, they are. She's got, she's got real problems." (Tr. 320).

Given this testimony, and the records and opinions provided by Dr. Steward, the

occurrence of episodic improvement did not constitute substantial evidence or a legally

valid reason to for the ALJ to reject Dr. Kowal's or Dr. Steward's opinions.  *See Sharp v.*

*Barnhart*, 152 Fed.Appx. 503, 508-09 (6th Cir. 2005)(Meniere's-disease case, discussing

"episodic illnesses" and disability determinations); *cf. Walker v. Secretary of HHS*, 980

F.2d 1066, 1071 ("The mere fact that certain doctors reported that Walker's physical

impairment had improved is not contradictory to a finding of disability. . . ."); *cf. also*

*Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990)(multiple-sclerosis case: periods of

remission and normal activity not dispositive where the plaintiff missed many work days

and condition progressively worsened).

The Commissioner missteps in the same manner as the ALJ by pointing to various

references in the records to improvement or remission in Plaintiff's condition.  *See* Doc.

#7, PageID #s 69-71 (and citations therein).  Such evidence does not overcome the ALJ's

failure to recognize the paroxysmal and fluctuating nature of Meniere's disease and to

consider this when determining whether Plaintiff's condition medically equaled Listing

2.07 and when evaluating Dr. Steward's and Dr. Kowal's opinions.

The ALJ also rejected Dr. Kowal's opinion as follows:

> Dr. Kowal's opinion is additionally undermined by the fact that he
> stated that the claimant's impairment equaled the requirement of section
> 2.07 . . . beginning the day that she reported significant improvement in her
> alleged vertigo and occasional mild disequilibrium.  (See, Exhibit 10-F at
> 8).  Dr. Kowal's only explanation was that claimant had this impairment,
> experienced some improvement, and then 'must have gotten worse.'  Such
> worsening is not supported by any treatment record notes or clinical
> observations in the record. . . .

23

(Tr. 20). A review of the hearing transcripts reveals that the ALJ never specifically asked Dr. Kowal to explain his testimony. *See* Tr. 321-23. Indeed, the ALJ asked only limited follow-up questions after Dr. Kowal testified that Plaintiff equaled Listing 2.07. *See id.* If the ALJ would have found a more specific or detailed explanation helpful, she could have simply asked Dr. Kowal to provide it. Yet, for the ALJ to remain effectively mum in the face of Dr. Kowal's opinion that Plaintiff equaled Listing 2.07, then to later discount his lack of explanation, seems a tactical-based – rather than evidence-based/regulation-based – approach to administrative decision-making.

Regardless, a more significant problem arises in paragraph three when the ALJ rejected Dr. Kowal's belief that Plaintiff's condition worsened after June 2005. The ALJ wrote, "Such worsening is not supported by any treatment notes or clinical observations in the record." (Tr. 20). To accept this a sufficient basis for affirming the ALJ's decision is unwarranted because of the ALJ's failure to acknowledge the fluctuating nature of Meniere's disease and the actual fluctuation in Plaintiff's symptoms over the years. Additionally, there is little reason to believe that more treatment notes or clinical observations after June 2005 – even records showing more episodes of improvement – would have changed Dr. Steward's 2007 opinion, due to the episodic nature of Plaintiff's vestibular symptoms and Meniere's disease.

And Dr. Steward found no reason to believe that Plaintiff's impairments improved significantly after June 2005. Instead, he wrote a letter in May 2007 documenting Plaintiff's medical history and explaining that he had treated Plaintiff since April 2002 for

"episodic vertigo, which has become progressive and debilitating since 2003." (Tr. 240).

He reviewed the course of his treatment and noted that "ENG testing in 2004, showed

persistent left-sided unilateral weakness. Repeat testing in 2006, again showed the same

results." (Tr. 240). Dr. Steward concluded:

> I believe the patient truly experiences vertigo and tinnitus, as well as
> disequilibrium. This results in debilitating impairment with waxing and
> waning symptoms resulting in variable levels of functioning such that I
> think it would be unlikely that this patient would be able to obtain gainful
> employment.

(Tr. 240). The ALJ neglected to discuss the consistency between this treating specialist's

opinion and Dr. Kowal's opinion that Plaintiff medically equaled Listing 2.07. *See* Tr.

20-21.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors is well

taken.

## VII.   **Judicial Award of Benefits**

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits. Under sentence four of 42

U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*,

501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous

principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Remand for payment of benefits is only warranted "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

A judicial award of benefits is warranted in the present case. "[A]ll essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176; *see Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *see also Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987).

In the present case, the evidence is strongly – if not overwhelmingly – supports the conclusion that Plaintiff's impairments medically equals Listing 2.07, including the records and May 2007 opinions provided by her long-term treating specialist, Dr. Steward, which are largely consistent the opinions provided by medical expert and specialist Dr. Kowal. Contrary probative evidence, if any, is weak, particularly where evidence of episodic improvements in Plaintiff's condition was both consistent with Dr. Steward's opinions and typical of Meniere's disease.

Accordingly, an Order remanding for benefits is warranted.

### IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability finding be vacated;

2.      Plaintiff's case be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for payment of DIB consistent with the Social Security Act; and

3.      The case be terminated on the docket of this Court.


February 8, 2012

  s/Sharon L. Ovington  
Sharon L. Ovington  
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within 14 days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to 17 days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within 14 days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).